# EXHIBIT 2

***EFILED***
Case Number 2019L 000444
Date: 3/27/2019 4:47 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

| | |
|---|---|
| JOEL BISHOP, DEAN COLMAN, and PETE LAVITE<br><br>*Plaintiffs,*<br><br>v.<br><br>PURDUE PHARMA L.P., PURDUE PHARMA, INC., PURDUE FREDERICK COMPANY, INC., RHODES PHARMACEUTICALS, CEPHALON, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., ENDO INTERNATIONAL PLC, JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMAEUTICA, INC., NORAMCO, INC., ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS, INC., ALLERGAN PLC, ACTAVIS PLC, WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC., ACTAVIS LLC, MALLINCKRODT PLC, MALLINCKRODT LLC, AMERISOURCEBERGEN CORPORATION, CARDINAL HEALTH, INC., MCKESSON CORPORATION, H.D. SMITH WHOLESALE DRUG CO.; H.D. SMITH, LLC; CVS HEALTH CORPORATION, Individually and d/b/a CVS PHARMACY, INC.; CVS INDIANA, LLC; WALGREENS BOOTS ALLIANCE, INC.; and WALGREEN CO.,<br><br>*Defendants.* | 2019L 000444<br><br>CASE NO: 2019-L-<br><br>**PLAINTIFFS DEMAND**<br><br>**A TRIAL BY JURY** |

## COMPLAINT FOR DAMAGES

## I. INTRODUCTION

1. This Complaint seeks a remedy and relief for Plaintiffs (hereinafter the "Veterans") against Defendants for targeting service members and veterans of the United States Armed Forces with their dangerous opioids.

2. During all times relevant, Defendants knew or should have known of the dangers of opioids, and hid those dangers from the public and treating physicians.

3. This concealment from and misrepresentation of facts toward the Veterans and their medical providers regarding opioids led to opioids being the most common means for treating chronic pain.[1]

4. Defendants' concealment began in 1999 with an aggressive marketing campaign to change the narrative surrounding their dangerous opioids. This campaign worked and the amount of opioids prescriptions per person tripled.[2]

5. While the number of opioid prescriptions has decreased since 2012, the amount of opioids in morphine milligram equivalents (MME) prescribed per person is still around three times higher than it was in 1999.[3]

6. During all relevant times, the Veterans and their prescribers through the Veterans Health Administration and private physicians were defrauded by Defendants and the Veterans each suffered irreparable injuries as described herein.

---

[1] Deborah Grady et al., *Opioids for Chronic Pain*, 171(16) Arch. Intern. Med. 1426 (2011).
[2] Prescription Opioid Data, CDC, https://www.cdc.gov/drugoverdose/data/prescribing.html (last visited February 14, 2018).
[3] *Id.*

7. The Veterans set forth the story of Defendants' conduct herein.

8. The Veterans' Complaint sets forth different categories of Defendants, which caused or contributed to Veterans' injuries.

9. "Manufacturer Defendants" created the opioids which have long been known to Defendants to contain addictive properties, which create the potential for abuse, particularly when used long-term for chronic, non-cancer pain management.

10. "Distributor Defendants" worked alongside Manufacturer Defendants in creating the opioid epidemic by flooding the market with opioids.

11. Instead of preventing abuse by reporting suspicious orders, Distributor Defendants sought to sell as many opioids as possible, breaching their statutory and common law duties owed to the public, including to the Veterans.

12. As a direct and proximate result of Defendants actions and omissions, the Veterans have suffered both diverse and serious injuries, of a lasting nature, which continue and will continue in the future.

## II. PARTIES

### A. THE VETERANS / PLAINTIFFS

#### 1. Joel Bishop

13. Veteran, Joel Bishop, currently resides in Wood River, Madison County, Illinois.

14. He is a Navy veteran who, in 2006, deployed in support of Operation Iraqi Freedom.

15. During his deployment he served as a "machine gunner," supporting an over-the-road mission through the war zone of Iraq and traveling some 10,000 miles by convoy.

16. During Veteran Bishop's deployment he sustained injuries to his back, feet, and calf, and those injuries were exasperated and worsened after coming home from his deployment.

17. After returning home from Iraq, Veteran Bishop sought treatment for these injuries and the related pain.

18. Veteran, Joel Bishop, was diagnosed with post-traumatic stress disorder ("PTSD") in 2018.

19. While receiving treatment for service related injuries to his back, feet, and calf, Veteran Bishop was prescribed Defendants' opioids including, but not limited to, morphine, oxycodone, Norco, Opana ER, acetaminophen-hydrocodone, MS Contin, acetominophen-oxycodone-hydrochloride and Tramadol.

20. After becoming addicted to opioids, Veteran Bishop became ensnared in addiction and suffers with that addiction and substance abuse dependency.

21. As a direct and proximate result of Defendants' actions and omissions, Veteran Bishop suffered tremendous injury as well as psychological and emotional damage, both internally and externally; that he suffered severe and permanent injuries; that he suffered from severe emotional distress; that Veteran Bishop sustained a severe shock and damage to his nervous system and other systems of his body; that he suffered acute and prolonged physical and mental pain and suffering; that he suffered from addiction and substance abuse dependency; and that he became liable for great sums of money for medical, hospital care and treatment, as well as incurring other expenses, including wage loss.

**2. Dean Colman**

22. Veteran, Dean Colman, currently resides in Alton, Madison County, Illinois.

23. He is a United States Marine Veteran, who was deployed in support of Desert Storm-Desert Shield in 1989.

24. Veteran Colman conducted military operations in Iraq.

25. In or around 1999, Veteran, Dean Colman, underwent a surgery to repair his cervical spine.

26. After surgery, Veteran Colman was prescribed opioids including, but not limited to, OxyContin, hydrocodone and oxycodone.

27. While taking the opioids as prescribed by his physicians, Veteran Colman became addicted to opioids.

28. Upon information and belief, Plaintiff was being overprescribed opioids during his treatment based upon the recommendations of Defendants.

29. As a direct and proximate result of Defendants' actions and omissions, Veteran Colman suffered tremendous injury as well as psychological and emotional damage, both internally and externally; that he suffered severe and permanent injuries; that he suffered from severe emotional distress; that Veteran Colman sustained a severe shock and damage to his nervous system and other systems of his body; that he suffered acute and prolonged physical and mental pain and suffering; that he suffered from addiction and substance abuse dependency; and that he became liable for great sums of money for medical, hospital care and treatment, as well as incurring other expenses, including wage loss.

**3. Pete Lavite**

30. Veteran, Pete Lavite, currently resides in Wood River, Madison County, Illinois.

31. He was a United States Marine veteran, who served from 1986 to 1990 in Japan, Korea, and the Philippines aboard the USS Cayuga.

32. Veteran Lavite was prescribed opioids beginning in 2002, and since then has taken various opioids, including but not limited to oxycodone, OxyContin, Vicodin, Percocet, morphine and fentanyl.

33. Upon information and belief, Veteran Lavite was being overprescribed opioids during his treatment based upon the recommendations of Defendants and Defendants' lack of warning.

34. After becoming addicted to opioids, Veteran Lavite began purchasing opioids through illicit means to support his addiction.

35. As a direct and proximate result of Defendants actions and omissions, Veteran Lavite has suffered tremendous injury as well as psychological and emotional damage, both internally and externally; that he suffered severe and permanent injuries; that he suffered from severe emotional distress; that Veteran Lavite sustained a severe shock and damage to his nervous system and other systems of his body; that he suffered acute and prolonged physical and mental pain and suffering; that he suffered from addiction and substance abuse dependency; and that he became liable for great sums of money for medical, hospital care and treatment, as well as incurring other expenses, including wage loss.

**B. DEFENDANTS**

**1. Manufacturer Defendants**

36. Defendant Purdue Pharma L.P. ("Purdue L.P.") is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut. Purdue Pharma, Inc. ("Purdue Inc.") is a New York corporation with its principal place of business in Stamford, Connecticut. The Purdue Frederick Company Inc. ("Purdue Frederick") is a New York corporation with its principal place of business in Stamford, Connecticut. Rhodes Pharmaceuticals, L.P. ("Rhodes") is a limited partnership organized under the laws of Delaware with its principal place of business in Coventry, Rhode Island. These four entities are collectively referred to herein as "Purdue" unless otherwise specified.

37. Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation and wholly owned subsidiary of Teva Ltd. in Pennsylvania. Teva Ltd. and Teva USA acquired Cephalon, Inc. in 2011. Teva Ltd. directs the business practices of Cephalon, Inc., and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva Ltd., Teva USA, and Cephalon, Inc. are referred to as "Cephalon" herein, unless otherwise specified.

38. Allergan PLC ("Allergan") is a public company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis Kadian LLC ("Actavis Kadian") is a Delaware corporation and subsidiary of Allergan, with its principal place of business in Morristown, New Jersey. Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware corporation with its principal place of business in Elizabeth, New Jersey. Actavis PLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis PLC acquired Allergan in March 2015, and the company took the Allergan name. Before that, Watson Pharmaceuticals, Inc. ("Watson Pharmaceuticals") acquired Actavis PLC in October 2012. Watson Laboratories, Inc. ("Watson Labs") is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan. Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as Watson Pharma, Inc.

39. Prior to 2016, Allergan was the corporate parent of Actavis, Actavis PLC, Actavis Pharma, Actavis Elizabeth, Actavis Kadian, Watson Pharmaceuticals, and Watson Labs (together, the "Actavis Generics"). In 2016, Teva USA wholly acquired the Actavis Generics. Teva Ltd. now

exercises control over these marketing and sales efforts, and the Actavis Generics products ultimately inure to its benefit. The Actavis Generics are referred to as "Actavis" herein, unless otherwise specified.

40. Janssen Pharmaceuticals, Inc. ("Janssen") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson, Inc. ("Johnson & Johnson"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Johnson & Johnson is the only company that owns over 10 percent of Janssen's stock, and the company corresponds with the FDA regarding Janssen's products. Johnson & Johnson controls the sale and development of Janssen's drugs, and Janssen's profits inure to Johnson & Johnson's benefit. Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware, and was a wholly owned subsidiary of Johnson & Johnson until July 2016. Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("Ortho-McNeil-Janssen") and Janssen Pharmaceutica, Inc., ("Jansen Pharmaceutica") are both Pennsylvania corporations with their principal places of business in Titusville, New Jersey. Both are now known as Janssen Pharmaceuticals, Inc. Janssen, Johnson & Johnson, Noramco, Ortho-McNeil-Janssen, and Janssen Pharmaceutica are referred to herein as "Janssen," unless otherwise specified.

41. Endo Health Solutions, Inc. ("Endo Health Solutions") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals, Inc. d/b/a Endo Generic Products ("Endo Pharmaceuticals") is a wholly owned subsidiary of Endo Health Solutions and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Par Pharmaceutical Companies, Inc. d/b/a Par Pharmaceutical ("Par Pharmaceutical) is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Endo Health Solutions acquired Par Pharmaceutical in September 2015. Endo Health Solutions now

exercises control over these marketing and sales efforts, and the Par Pharmaceutical products ultimately inure to its benefit. Endo Health Solutions, Endo Pharmaceuticals, and Par Pharmaceutical are collectively referred to herein as "Endo," unless otherwise specified.

42. Mallinckrodt, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with a U.S. headquarters in St. Louis, Missouri. Mallinckrodt, LLC is a limited liability company organized and existing under the laws of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, PLC. These entities are referred to herein as "Mallinckrodt," unless otherwise specified.

43. Collectively, Purdue, Cephalon, Endo, Janssen, Actavis, and Mallinckrodt are referred to as "Manufacturer Defendants" herein when describing the activities of these parties together, and as "Defendants" when describing them along with the other Defendants in this action.

**2. Distributor Defendants**

44. AmerisourceBergen Corporation ("AmerisourceBergen") is a Delaware corporation with its principal place of business located in Chesterbrook, Pennsylvania. AmerisourceBergen operates a distribution center in Romeoville, Illinois.

45. Cardinal Health, Inc. ("Cardinal Health") is an Ohio corporation with its principal office location in Dublin, Ohio. Cardinal Health operates distribution centers in Aurora and Waukegan, Illinois.

46. McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California. McKesson operates a distribution center in Aurora, Illinois.

47. Defendant H.D. Smith Wholesale Drug Co. is a Delaware corporation with its principal place of business in Springfield, Illinois. Defendant H.D. Smith, LLC is a limited liability

company organized in Delaware and maintains the assumed names of H.D. Smith, LLC and H.D. Smith Wholesale Drug Co. through its filing with the Illinois Secretary of State. Located in the State of Illinois, H.D. Smith Wholesale Drug Co. and H.D. Smith, LLC, together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "H.D. Smith"), are wholesalers of pharmaceutical drugs and distribute opioid drugs throughout the State of Illinois. H.D. Smith has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation. H.D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic and specialty pharmaceuticals. At all times relevant, H.D. Smith distributed prescription opioids throughout the United States, including in Illinois.

48. Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business in Illinois.

49. Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinios. Walgreen Co. is a subsidiary of Walgreens Boots Alliance, Inc. and does business under the trade name Walgreens, including business conducted through its Walgreens Warehouses.

50. Walgreens Boots Alliance, Inc. and Walgreen Co., together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Walgreens"), are wholesalers of prescription opioid drugs and distribute opioids throughout the country, including in Illinois. Walgreens has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

51. Together, AmerisourceBergen, Cardinal Health, McKesson, H.D. Smith, and Walgreens collect about 85 percent of the revenues for prescription drugs distributed in the United States.

52. AmerisourceBergen, Cardinal Health, McKesson, H.D. Smith, and Walgreens are referred to herein as "Distributor Defendants" when describing the activities of the three parties together, and as "Defendants" when describing them along with the other Defendants in this action.

53. **Agency and Authority:** All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, directors, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## III. JURISDICTION AND VENUE

54. Pursuant to Section 9 of the Illinois Constitution, this Court has subject matter jurisdiction over the Veterans' claims.

55. Pursuant to 735 ILCS 5/2-209, this Court retains jurisdiction over each Defendant as all Defendants have conducted substantial business in Illinois which has caused harm in the State and to its Veteran citizens.

56. There is no federal court diversity jurisdiction in that there is not complete diversity of citizenship. Specifically, Defendants H.D. Smith, LLC and Walgreens Boots Alliance, Inc. are citizens of the State of Illinois, and the Veterans are citizens of the state of Illinois.

57. There is also no federal question jurisdiction. All of the causes of action pleaded herein are brought pursuant to Illinois statute or Illinois common law. While the Complaint

contains reference to the federal Controlled Substances Act, 21 U.S.C. §§ 801, et seq., and Code of Federal Regulations, there is no cause of action brought pursuant to federal law.

58. There is similarly no federal jurisdiction over the Veterans' state law claims, because there is not a federal issue that is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. For every cause of action pleaded herein, the Veterans allege, independent and exclusive of federal law or regulation, underlying theories of liability predicated upon breaches of duty derived from Illinois State laws and regulations, including, *inter alia*, the Illinois Controlled Substances Act (720 ILCS 570/100, *et. seq.*), the Illinois Wholesale Drug Distribution Licensing Act (225 ILCS 120/1, *et seq.*), and Part 1510 of Title 68 of the Illinois Administrative Code.

59. Venue is proper in Madison County, Illinois because Defendants have conducted business transactions in Madison County and the Veterans are located in Madison County, and the causes of action arose, in substantial part, in Madison County, Illinois.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Opioids and Their Effects

60. Opioids include all drugs derived in whole or in part from the opium poppy. In the medical context, opioids include pain relief drugs obtainable by prescription, such as oxycodone, hydrocodone, codeine, morphine, and fentanyl.

61. While opioids have been prescribed for years to treat chronic non-cancer pain, the efficacy of long-term opioid use for such ailments has never been reliably demonstrated through sufficient evidence or high-quality scientific research.[4]

[4] *See* Hasan Pathan & John Williams, *Basic Opioid Pharmacology: An Update*, 6 British J. of Pain 11 (2012) (noting, specifically, that no study has found that long-term opioid use is beneficial).

62. One thing is certain about opioids, however: opioid users develop a tolerance for the drug, "typically require[ing] increasingly higher doses in order to maintain the initial level of analgesia—up to 10 times the original dose."[5] As time passes, the opioid user must take more and more opioids to feel "normal," to produce pleasure comparable to prior opioid uses, and to avoid any negative symptoms of withdrawal.[6]

63. This vicious cycle, if left unchecked, results in addiction.

**B. The Manufacturer Defendants' Scheme to Change Prescriber Habits and Public Perception to Increase Demand for Opioids**

64. In the late 1990's, medical professionals found opioids effective for limited purposes: treating post-surgical pain, acute short-term pain, and for end-of-life pain management.

65. Due to the limited market for their opioid products, Manufacturer Defendants, individually and collectively, implemented a scheme that would expand the use of their dangerous drugs.

66. In order to market their dangerous drugs to the public, Manufacturing Defendants utilized:

a. Key Opinion Leaders ("KOL's"), doctors who Manufacturing Defendants utilized to spread aggressive and false pro-opioid marketing in exchange for money, prestige, research funding, and avenues for publication;

b. False, misleading, and unsupported medical and popular literature about opioids that understated the risks and overstated the benefits of long-term opioid use;

---

[5] Nora D. Volkow & A. Thomas McLellan, Opioid Abuse in Chronic Pain – Misconception and Mitigation Strategies, 374 N. Eng. J. Med. 1253 (2016); *see also* Chante Buntin-Mushock, et al., *Age-Dependent Opioid Escalation in Chronic Pain Patients*, 100 Anesthesia & Analgesia 1740 (2005) (noting observation of "[r]apid opioid dose escalation" in daily opioid therapy patients in a study assessing the relationship between age and opioid tolerance).
[6] *Id.*

c. Biased treatment guidelines that called for a more widespread use of their prescription opioid drugs than contemporary science and medicine justified;

d. Continuing Medical Education programs ("CME's), which Manufacturing Defendants sponsored, where they could spread deceptive and biased messages that inflated the benefits of opioid use while omitting or downplaying the drugs' risks and adverse effects;

e. Front Groups that would generate deceptive, pro-opioid materials and programs aimed at influencing doctors and patients to utilize chronic opioid therapy, in exchange for funding;

f. Published advertisements that deceptively portrayed the benefits and risks of opioid therapy for treating chronic pain; and

g. Sales representatives and self-recruited physician speakers, who aggressively spread misinformation about the efficacy of opioids for long-term pain management.

67. Manufacturer Defendants' marketing of opioids for long-term use to treat chronic pain included information that was false, misleading, contrary to credible scientific evidence, and lacked balance and substantiation. Manufacturer Defendants' representations about opioids misled the public by:

a. Downplaying the risk of addiction;

b. Creating and promoting the concept of "pseudoaddiction"[7] when signs of actual addiction began appearing;

c. Advocating that doctors should treat the signs of addiction with more opioids;

d. Downplaying the difficulty of managing opioid dependence and withdrawal;

e. Denying the risks of taking increasingly higher doses of prescription opioids over time; and

f. Exaggerating the efficacy of 'abuse-deterrent' opioid formulations to prevent abuse and addiction.

---

[7] The concept of "pseudoaddiction" refers to a scientifically unproven – yet frequently touted by the opioid industry – notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain.

68. Manufacturing Defendants' conduct is particularly egregious, as they were warned by government regulators on numerous occasions regarding the lack of support for their contentions.[8]

69. Moreover, Defendants were well aware of the falsity of their representations, as they had access to prescription drug data, medical reports of adverse reactions, and studies, all demonstrating the dangers of opioids in chronic pain management.[9]

70. Each of the Manufacturing Defendants engaged in specific acts to deceptively encourage the public to use their opioid products. Some specific examples of their unlawful conduct are detailed below.

**1. Purdue**

71. Purdue is responsible for producing OxyContin, MS Contin, Dilaudid, Hysingla ER, and Targinq ER.

72. In promoting the sale and use of its flagship opioid, OxyContin, Purdue engaged in various deceptive and unlawful acts, including:

a. Falsely marketing extended-release OxyContin as superior to immediate-release opioids and simultaneously downplaying risks of addiction;

b. Instructing physicians to prescribe stronger and stronger doses of OxyContin for patients who continue to complain of pain and/or become tolerant to their product;

c. Publishing education pamphlets, such as *Providing Relief, Preventing Abuse*, that deceptively portray the signs and prevalence of addiction, while promoting the

[8] Letter from Janet Woodcock, M.D., Director, Ctr. For Drug Evaluation & Research, to Andrew Kolodny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), available at http://bit.ly/2F430US.

[9] As twelve United States Congressmen reported to the World Health Organization in May 2017: "Internal documents revealed in court proceedings now tell us that since the early development of OxyContin, Purdue was aware of the high risk of addiction it carried." *See* Letter from Members of Congress to Dr. Margaret Chan, Director-General, World Health Organization (May 3, 2017), http://katherineclark.house.gov/_cache/files/a577bd3c-29ec-4bb9-bdba-1ca71c784113/mundipharma-lettersignatures.pdf.

fiction of "pseudoaddiction;"

d. Utilizing APF, a front group, to create and disseminate publications that misrepresent the risks of long-term opioid use; and

e. Contributing to misleading publications, such as *Exit Wounds*, which describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines.

73. Following Purdue's launch of OxyContin in 1996, Purdue engaged in various forms of deceptive conduct to improve the drug's sales through 2007. This included:

a. Purdue's staff misrepresenting or negligently misrepresenting to doctors information regarding OxyContin's potency, as the truth of highly addictive nature would have reduced OxyContin sales;

b. Recruiting hundreds of sales representatives and improperly and negligently training them to sell Purdue's opioids for uses that were not safe;

c. Planning public releases that would "deflect attention away from company owners" in order to conceal their wrongdoing from the public; and

d. Intentionally stigmatizing those who became addicted to Purdue's products as addicts and "reckless criminals" in order to further conceal opioids' true nature from the public.

74. Purdue's aforementioned conduct led to investigation from the state attorney generals, the DEA, and the U.S. Department of Justice. By 2006, prosecutors had found damning evidence that Purdue had intentionally deceived doctors and patients about its opioids.

75. As a result of this investigation, Purdue admitted to an Agreed Statement of Facts which stipulated that, for more than six years, supervisors and employees of Purdue had intentionally deceived doctors about OxyContin. Furthermore, a plea agreement was entered admitting guilt.

76. Following this guilty plea, a 2007 judgment ordered Purdue not to make written or oral claims that are false, misleading, or deceptive in future promotions or marketing of OxyContin. It also required that Purdue establish and follow an abuse and diversion detection program.

77. This judgment should have ended Purdue's misconduct for good.

78. Instead, the Purdue chose to continue to break the law, expanding its deceptive sales campaign and continuing to exploit patients for financial gain. Purdue's continued misconduct included:

a. Directing hundreds of Purdue sales representatives to visit the most prolific prescribers of their opioids and encouraging these doctors to prescribe more of the highest doses of opioids;

b. Blatantly ignoring their promises to help prevent diversion by continuing to push opioids to those who prescribed the largest quantities of their drugs;

c. Creating and distributing thousands of deceptive marketing materials which, among other things, falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead would improve patients' quality of life. These materials also falsely promoted the notion of "pseudoaddiction," indicating that patients with this made up complex should be given more opioids; and

d. Continuing to conceal the danger of addiction by blaming the terrible consequences of opioids on drug abuse, labeling those hurt by their products as "junkies" and "criminals."

79. Throughout the course of their wrongful conduct, ample evidence demonstrates that Purdue was quite aware of the deceptive nature of its conduct and of its opioids' dangerous propensities. Despite this knowledge, Purdue continued to spread misinformation to increase its bottom line.

80. Purdue engaged in various additional wrongful acts, including:

a. Hiring hundreds of additional sales reps to carry out Purdue's unfair and deceptive sales tactics;

b. Implementing compensation policies that aggressively drove opioid sales by placing emphasis on prescription volume rather than on compliance;

c. Paying millions of dollars to two of Purdue's former executives to help the maintain their loyalty, thereby helping to conceal the true nature of the unlawful conduct from the public and the Veterans;

d. Utilizing a campaign driving patients to take opioids at higher doses for longer periods of time, to increase sales;

e. Working as part of the team that created *In the Face of Pain*, a particularly deceptive marketing campaign that presented misleading prescriber testimonials about the use of opioids for pain management;

f. Sending misleading publications to physicians and engaging in deceptive promotion of Purdue opioids;

g. Sending sales reps to the Military Healthcare Convention & Conference to promote Purdue's opioids to vulnerable veterans; and

h. Undertaking a misleading public relations campaign to make the public believe that Purdue was helping to fight the opioid crisis, all while continuing Purdue's strategy of misleading prescribers to induce them to prescribe Purdue's opioids.

81. As a direct result of Purdue's wrongful conduct, the Veterans suffered injury.

**2. Cephalon**

82. Cephalon is responsible for producing Actiq, Fentora, and Generic Oxycodone Hydrochloride.

83. In promoting the sale and use of its opioid drugs, Cephalon engaged in various deceptive and unlawful acts, including:

a. Sending sales representatives to non-oncologists to aggressively market Actiq and Fentora, two cancer pain drugs, to a consumer base not afflicted with cancer;

b. Falsely marketing Actiq for off-label uses;

c. Contributing to the creation of misleading prescription guidelines, articles, and CMEs dealing with opioids; and

d. Paying physicians thousands of dollars every year to publicly opine that opioids are safe, effective, and non-addictive for a wide variety of uses, contrary to all authoritative research on these dangerous drugs.

**3. Actavis**

84. Actavis is responsible for producing Kadian.

85. In promoting the sale and use of Kadian, Actavis engaged in various deceptive and unlawful acts, including:

a. Severely downplaying the risk of addiction associated with Kadian and other opioids to physicians, suggesting that few patients would become addicted to the drugs and that only those with a prior history of abuse are at risk for addiction;

b. Training physician speakers to spread deceptive messages, claiming that opioids can be used with minimal risk for chronic pain patients without a history of abuse or addiction;

c. Promoting the fiction of "pseudoaddiction," deceptively giving prescribing doctors a false sense of security regarding the types of patients who can become addicted to opioids and the types of behaviors these patients exhibit; and

d. Conducting "studies" with predetermined outcomes that misrepresented the benefits and risks of opioid use.

**4. Janssen**

86. Janssen is responsible for producing Duragesic, Nucynta, and Nucynta ER.

87. In promoting the sale and use of its opioid drugs, Janssen engaged in various deceptive and unlawful acts, including:

a. Falsely marketing Duragesic as having a low potential for abuse and making a series of unsubstantiated, false, and misleading claims regarding Duragesic's effectiveness;

b. Instructing sales representatives to market Duragesic to physicians as having better efficacy, better tolerability, and better patient compliance, despite these

assertions being utterly false;

c. Hiring speakers to promote its drugs while omitting the risks of misuse, abuse, addiction, hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and other known, serious risks associated with chronic opioid therapy;

d. Sponsoring the creation of patient education guides, such as *Finding Relief*, that misrepresented the risks associated with opioid use, specifically stating that long-term use of opioids is safe and that the risk of addiction is low; and

e. Financially contributing to misleading publications, such as *Exit Wounds*, which describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines.

**5. Endo**

88. Endo is responsible for producing Opana, Percodan, Percocet, Oxycodone, Oxymorphone, Hydromorphone, and Hydrocodone.

89. In promoting the sale and use of its opioid drugs, Endo engaged in various deceptive and unlawful acts, including:

a. Instructing sales representatives to falsely market Opana, stating, among other things, that the drug was "crush-resistant" and, as a result, less likely to be abused;

b. Circulating misleading education pamphlets, such as *Living with Someone with Chronic Pain,* which suggested that addiction to opioids was not a substantial concern;

c. Deceptively implying that chronic opioid therapy would improve patients' ability to function; and

d. Financially contributing to misleading publications, such as *Exit Wounds*, which describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines.

**6. Mallinckrodt**

90. Mallinckrodt is responsible for producing Exalgo, Rosicodone, and Methadose.

91. In promoting the sale and use of its opioid drugs, Mallinckrodt engaged in various deceptive and unlawful acts, including:

a. Mischaracterizing the risk of addiction to their drugs through its website, sales force, and unbranded communications through third-parties;

b. Promoting deceptive and misleading publications that misstated the risks associated with opioid use, including *Defeat Chronic Pain Now!*, a book claiming that patients "rarely develop a true addiction and drug craving" when taking opioids; and

c. Making thousands of payments to physicians, both to coerce them to prescribe their opioids and to hire them to spread misinformation about opioids to other prescribers.

**C. The Distributor Defendants Disregarded Their Duties to Maintain Effective Controls to Prevent Diversion and to Identify, Report, and Take Steps to Halt Suspicious Orders.**

92. While the supply chain for prescription opioids starts with manufacturers and ends with institutional actors like pharmacies and hospitals, this product stream typically passes through distributors, such as Defendants Cardinal, AmerisourceBergen, McKesson, H.D. Smith, and Walgreens.

93. Because drug distributors are uniquely situated in the supply chain as an intermediary between drug manufacturers and the points of sale/distribution, drug distributors are a "chokepoint" in the drug supply chain that can monitor and analyze orders of controlled substances and report orders as "suspicious" to law enforcement agencies. This is crucial for preventing diversion.[10]

---

[10] 'Diversion' occurs whenever the pills are able to be redirected along the supply chain for an illicit use, including both patently illegal uses (*i.e.*, drug dealing) as well as misuses that, while not necessarily illegal, do not represent the proper use of prescription opioids.

94. For this reason, both federal and state law require distributors like the Distributor Defendants to take affirmative steps to prevent the diversion of opioid drugs.

95. On the federal side, the Controlled Substances Act of 1970 imposes responsibilities on Distributor Defendants to investigate, report, and stop suspicious orders of prescription drugs.

96. Distributor Defendants also have obligations under Illinois state law, as the Illinois legislature has adopted its own Controlled Substances Act[11] and the Wholesale Drug Distribution Licensing Act[12]. Furthermore, the State of Illinois expressly incorporates the aforementioned federal requirements into its own provisions.[13]

97. Despite having received ample guidance on their duties as distributors of massive amounts of opioids, Distributor Defendants have acted in reckless disregard to their obligations by supplying opioids to suspicious physicians and pharmacies and failed to report suspicious orders of the same to the DEA.

98. Distributor Defendants have yielded financial benefits from the diversion of opioid drugs, both in the form of discounts and rebates they have received by selling a higher volume of opioid pills and in rebates Manufacturer Defendants sent to Distributor Defendants as a way to help them boost opioid sales.

99. As a result of their unlawful conduct, countless opioid pills were available to the public, including the Veterans, contributing to the opioid crisis and nationwide addiction.

[11] 720 ILCS 570 *et seq.*
[12] 225 ILCS 120/1 *et seq.*; *see also* Ill. Admin. Code § 1510.50.
[13] Ill. Admin. Code § 1510.50(i).

**D. Defendants Specifically Targeted and Exploited the Veterans For Their Own Financial Gain**

100. According to a study published in the 2013 *Journal of American Medicine*, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries. A 2008 survey showed that prescription drug misuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years. Veterans are twice as likely as non-veterans to die from an opioid overdose.

101. In addition to the Defendants' aforementioned unlawful conduct when promoting opioids to the general public, Defendants also took steps to target specific, vulnerable groups. One such group consisted of current and former veterans of the United States Armed Forces.

102. Many of Defendants' efforts to prey upon veterans came about after September 11, 2001 when the United States went to war. Defendants would profit from the war in two ways.

103. First, Defendants would receive a wave of targets to set their sights upon: our nation's veterans.[14] The Veterans were particularly susceptible to Defendants' manipulations surrounding opioids, as the Veterans were very likely to suffer from chronic pain after returning from war.[15]

---

[14] America's involvement in conflicts after September 11, 2001 would become the longest conflicts in American history, deploying over 2.7 million service members to combat theatres. Over 6,000 service members would lose their lives in the conflicts with thousands more receiving service-related wounds and injuries.

[15] A study from the National Institutes of Health found that "veterans were about 40 percent more likely to experience severe pain than nonveterans." *Veterans Endure Higher Pain Severity than Nonveterans,* National Institutes of Health, Dec. 13, 2016, https://nccih.nih.gov/news/press/veterans_pain.

104. Second, Defendants could target the Veterans Health Administration and Veterans' Tricare Program, organizations funded with substantial amounts of public money.

105. Defendants' efforts to target these organizations were quite successful. This is best exemplified when, in 2001, Defendant Purdue commented on how successful its marketing to the Veterans Health Administration had become. In this marketing push, Purdue paid $200,000 to the Veteran's Affairs Pain Management team to create pro-opioid propaganda.[16]

106. To facilitate and profit from its plan to market these dangerous drugs to veterans, Defendants intentionally and/or in reckless disregard to the potential consequences created an atmosphere where prescription opioids would freely enter the market place, including public and private health providers, despite Defendants' obligation to monitor opioids at every stage of the stream of commerce. The specific conduct used to carry out this action has been outlined and discussed at length in previous sections of this complaint.

107. Further, Defendants, pushed a narrative that "trustworthy" patients do not get addicted. This narrative helped the Defendants to target those in the armed service, since veterans are one of America's most revered groups and considered to be very trustworthy.

108. To further their agenda of targeting veterans, Defendants funded webinars related to pain care for veterans where opioids were pushed on the veterans' prescribers as an effective pain management tool.

109. Manufacturing Defendants furthered Manufacturer Defendants' plan by engaging in similar acts as described herein.

---

[16] Art Levine, *How the VA Fueled the National Opioid Crisis and Is Killing Thousands of Veterans*, Newsweek Magazine, Oct. 12, 2017.

110. Defendants also utilized publications and other direct marketing strategies to coerce veterans and their prescribers to utilize opioids for pain management.

111. One such publication from Purdue, Endo, and Janssen, *Exit Wounds*, was particularly egregious, characterizing opioids as "underused" and "the gold standard of pain medications."

112. Due to the Defendants' deceitful, unlawful, and/or reckless conduct, many veterans received prescriptions for opioids to manage their chronic pain. In 2009, military doctors wrote four times as many prescriptions for narcotic pain pills as they had in 2001.

113. Due to the dramatic increase in opioid prescriptions to veterans, the Veterans Health Administration saw an increase of 30% in veterans diagnosed with opioid abuse or opioid use disorder.[17]

114. The Veterans were a few of those caught up in the misinformation network created by Defendants.

115. Defendants undertook active efforts to deceive the Veterans and to purposefully conceal their unlawful conduct while assuring the public, including the Veterans and their prescribing physicians, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status with the DEA, and wholesale drug distributor license status with the State, and to continue generating profits.

---

[17] Gordon, A. J., Trafton, J. A., Saxon, A. J., Gifford, A. L., Goodman, F., Calabrese, V. S., Liberto, J. (2007). Implementation of buprenor phine in the Veterans Health Administration: Results of the first 3 years. Drug and Alcohol Dependence, 90, 292–296.

116. The Defendants were deliberate in taking steps to conceal their behavior and took an active role in the deceptive marketing practices resulting in the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

117. As set forth herein, the Manufacturer Defendants deliberately worked through Front Groups purporting to be patient advocacy and professional organizations, through public relations companies hired to work with the Front Groups and through paid KOLs to secretly control messaging, influence prescribing practices and drive sales. The Manufacturer Defendants concealed their role in shaping, editing, and approving the content of prescribing guidelines, informational brochures, KOL presentations and other false and misleading materials addressing pain management and opioids that were widely disseminated to regulators, prescribers and the public at large. They concealed the addictive nature and dangers associated with opioid use and denied blame for the epidemic. Instead, they attributed it solely to abuse and inappropriate prescribing. They manipulated scientific literature and promotional materials to make it appear that misleading statements about the risks, safety and superiority of opioids were actually accurate, truthful, and supported by substantial scientific evidence. Through their public statements, omissions, marketing, and advertising, the Manufacturer Defendants' deceptions deprived the Veterans of actual or implied knowledge of facts sufficient to put the Veterans on notice of potential claims. The Veterans neither knew nor should they have known of the concealed dangers of Manufacturer Defendants' products.

118. Defendants intended that their actions and omissions would be relied upon, including by the Veterans. The Veterans did not know, and did not have the means to know, the truth, due to Defendants' actions and omissions.

## V. LEGAL CAUSES OF ACTION

### COUNT I – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILCS 505/1 *et seq.*

### (Against Manufacturer Defendants for Deceptive Business Practices)

119. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

120. This Count is brought by the each of the Veterans in that they have reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, and further that this action is in the interest of the Veterans. Count I is brought pursuant to Section 10(a) of the Fraud Act, 815 ILCS 505/10(a).

121. The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2.

122. The Manufacturer Defendants have engaged in unlawful and deceptive business practices in violation of the ICFA as set forth above.

123. The Manufacturer Defendants' practices as described in the Complaint are deceptive business practices that violate the ICFA because the practices were and are intended to deceive consumers and occurred and continue to occur in the course of conduct involving trade and commerce throughout Illinois.

124. At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties and/or by aiding and abetting third parties, violated the ICFA by making and disseminating untrue, false, and misleading statements to Illinois prescribers and the Veteran/consumers to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false and misleading statements about opioids to be made or disseminated to Illinois prescribers and the Veterans in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements included, but were not limited to:

a. Claiming or implying that opioids would improve the Veterans' function and quality of life;

b. Mischaracterizing the risk of opioid addiction and abuse, including by stating or implying the opioids were rarely addictive, that "steady state" and abuse-resistant properties meant the drugs were less likely to be addictive or abused, and that specific opioid drugs were less addictive or less likely to be abused than other opioids;

c. Claiming or implying that addiction can be avoided or successfully managed through the use of screening and other tools;

d. Promoting the misleading concept of pseudoaddiction, thus concealing the true risk of addiction;

e. Mischaracterizing the difficulty of discontinuing opioid therapy, including by mischaracterizing the prevalence and severity of withdrawal symptoms;

f. Claiming or implying that increased doses of opioids pose no significant additional risk;

g. Misleadingly depicting the safety profile of opioids prescribed by minimizing their risks and adverse effects while emphasizing or exaggerating the risks of competing products, including NSAIDs;

h. In the case of Purdue, mischaracterizing OxyContin's onset of action and duration of efficacy to imply that the drug provided a full 12 hours of pain relief; and

i. Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

125. At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated ICFA by making statements that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain. The Manufacturer Defendants and their third-party allies repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, significant risks of side effects, and their risks compared to alternative treatments, including NSAIDs. Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain. Physicians in Illinois and elsewhere were actually deceived by this pattern of practices, and overprescribed opioids and failed to warn of the dangers of opioids to the Veterans and others.

126. At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, made and disseminated the foregoing untrue, false and misleading statements, and material omissions, through an array of marketing channels, including but not limited to: in-person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; studies, and journal articles and supplements; advertisements; and brochures and other patient education materials.

127. The Manufacturer Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, the Manufacturer Defendants knew or should have known

that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

128. The third-party KOLS and Front Groups which the Manufacturer Defendants aided and abetted likewise knew at the time of making or disseminating these misstatements and material omissions that such statements were untrue, false, or misleading and therefore likely to deceive the public. The Manufacturer Defendants were aware of the misleading nature of the misstatements and material omissions made by KOLs and Front Groups, and yet the Defendants provided them substantial assistance and encouragement by helping them develop, refine and promote these misstatements and material omissions and distributing them to a broader audience, including physicians. The Manufacturer Defendants also substantially encouraged the dissemination of these misstatements and material omissions by providing the Front Groups and KOLs with funding and technical assistance for the shared purpose of issuing misleading, pro-opioid messaging.

129. In sum, the Manufacturer Defendants: (a) directly engaged in untrue, false, and misleading marketing of KOLS and Front Groups; and (b) aided and abetted the untrue, false, and misleading marketing of KOLS and Front Groups. Thus, while the Defendants made, controlled, and disseminated deceptive marketing themselves, the Manufacturer Defendants made, controlled, and disseminated deceptive marketing themselves, the Manufacturer Defendants also are independently liable for the deceptive activity of third parties.

130. All of this conduct, separately and collectively, was intended to deceive the Veterans who used or paid for opioids for chronic pain. Said conduct violates and offends the public policy of Illinois. It has caused substantial injury to the Veterans and others as described herein.

131. As a direct result of the foregoing acts and practices, the Manufacturer Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the ICFA as described in this Complaint.

132. In addition, 815 ILCS 505/10(a) specifically allows the individual Veterans to bring this claim for a penalty for each violation by the Defendants.

133. The Veterans seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including actual damages, restitution, disgorgement of profits, payment of all civil penalties permissible under 815 ILCS 505/10 compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Veterans such other, further, and different relief as this Honorable Court may deem just.

**COUNT II – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

**815 ILCS 505/1 *et seq.***

**(Against Distributor Defendants for Deceptive Business Practices)**

134. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

135. This Count is brought by the Veterans who have reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.* Count IV is brought pursuant to Section 10 of the Fraud Act, 815 ILCS 505/10(a).

136. The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to

the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2.

137. The Distributor Defendants have engaged in unlawful and deceptive business practices in violation of Fraud as set forth above.

138. As evidenced by the conduct detailed above, the Distributor Defendants have violated Section 2 of the Fraud Act, 815 ILCS 505/2, by engaging in one or more of the following deceptive methods, acts and practices:

a. The method, act or practice of not monitoring for suspicious orders of prescription opioids;

b. The method, act or practice of not detecting suspicious orders of prescription opioids;

c. The method, act or practice of not investigating suspicious orders of prescription opioids;

d. The method, act or practice of filling, or failing to refuse fulfillment of, suspicious orders of prescription opioids;

e. The method, act or practice of not reporting suspicious orders of prescription opioids;

f. The method, act or practice of rewarding increases in prescription opioid sales; and/or

g. The method, act or practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

139. All of Defendants' deceptive methods, acts or practices were conducted with the intent on Defendants' part that the Veterans rely on the deception, false pretenses, false promises, and misrepresentations. Said conduct violates and offends the public policy of Illinois and has caused substantial injury to the Veterans.

140. All of Defendants' deception, false pretenses, false promises, and misrepresentations were methods, acts or practices occurring in the course of conduct involving trade or commerce.

141. All of Defendants' deceptive methods, acts or practices harmed or damaged the Veterans.

142. Some or all of Defendants' violations of the Fraud Act were committed with the intent to defraud, and many or all violations were continuous in nature.

143. Section 7 of the Fraud Act, 815 ILCS 505/7, empowers this Court to grant relief as it may find appropriate to halt and redress violations of the Fraud Act, including restitution, civil penalties, and costs.

144. The Veterans by and through their attorneys, seek all legal and equitable relief as allowed by law, including actual damages, restitution, disgorgement of profits, payment of all civil penalties permissible under 815 ILCS 505/7(b) and (c), compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Veterans such other, further, and different relief as this Honorable Court may deem just.

**COUNT III – NEGLIGENCE AND NEGLIGENT MISREPRESENTATION – ILLINOIS COMMON LAW**

**(Against All Defendants)**

145. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

146. This Count for common law negligence and negligent misrepresentation is brought by the Veterans against all Defendants.

147. "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1096 (Ill. 2012) (quot. & cit. om.). All such essential elements exist here.

148. To state a cause of action for negligent misrepresentation, a complaint "need allege only that the defendant was careless or negligent in ascertaining the truth of the statement, and that the defendant had a duty to convey accurate information to the plaintiff." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 424 (Ill. App. 2015) (quot. & cit. om.). All such essential elements exist here.

149. Each Defendant had an obligation to exercise due care in marketing, selling, and distributing highly dangerous opioid drugs to the Veterans' providers and the Veterans.

150. Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs to the Veterans' providers and the Veterans.

151. If a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. *Simpkins*, 965 N.E.2d at 1097. Each Defendant owed a duty to the Veterans, and to the public health and safety of the Veterans, because the injuries were foreseeable, and in fact foreseen, by the Defendants.

152. In addition, each Defendant owed a duty to the Veterans, because the injury was likely. Each Defendant was required to guard against the injury as a requirement for the licenses each Defendant maintains, and the burden of guarding against the injury was voluntarily assumed and not unduly onerous. The burden of guarding against the injury is properly placed upon each Defendant, and indeed, federal and state licensing and registration requirements required that each Defendant guard against the diversion of dangerously addictive opioids for illicit purposes.

153. Reasonably prudent manufacturers and distributors would have anticipated that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction. As explained above, the system whereby manufacturers and distributors are the gatekeepers between manufacturers and pharmacies exists ***for the purpose*** of controlling dangerous substances such as opioids. Defendants were repeatedly warned by law enforcement. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

154. The existence of a duty depends on the foreseeability of the injury. Each Defendant owed a duty to the Veterans, because the injuries alleged herein were foreseeable, and in fact foreseen, by the Defendants.

155. Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, and would have anticipated the significant costs, which would be imposed upon victims such as Veterans. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

156. Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

157. Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

158. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

159. As described above in language expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for non-medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

160. Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids.

161. Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled Substances, by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

162. The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

163. All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

164. Defendants' breaches were reckless and/or intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

165. The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

166. As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

167. Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

168. Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

169. The Veterans seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including actual damages, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IV – NEGLIGENCE PER SE

## (Against All Defendants)

170. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

171. Illinois set out in 720 ILCS 570/205; 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50; are public safety laws. Each Defendant had a duty under, *inter alia,* these laws to maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids to prevent injury. *See, e.g.*, 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3).

172. The Veterans, as citizens of the State of Illinois, are part of the class of individuals intended to be protected by the above statutes, regulations and rules.

173. The Veterans' injuries are the type of injury the statutes, regulations, and rules above are intended to prevent against.

174. Defendants' actions and omissions in violation of the law discussed above constitute negligence per se.

175. Defendants' actions and omissions were intentional and/or unlawful, and Defendants acted with actual malice.

176. It was foreseeable that the breach of duty described herein would result in the personal injury and economic damages for which the Veterans seek recovery.

177. As described above in language expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes requiring that as wholesale drug distributors,

Defendants could only distribute these dangerous drugs under a closed system – a system Defendants were responsible for guarding.

178. As described above in language expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, and proximately resulted in, harm and damages sought by the Veterans.

179. The Veterans seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including personal injury, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT V – CIVIL CONSPIRACY

### (Against All Defendants)

180. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

181. Defendants engaged in a civil conspiracy in their unlawful and tortious marketing of opioids and/or distribution of opioids into Illinois and the Veterans' Community as set forth herein.

182. Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing of opioids and/or distribution of opioids into Illinois and the Veterans' Community.

183. Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

184. Defendants Cephalon, Endo, Janssen, and Purdue each conspired with various KOLs and Front Groups to commit unlawful acts or lawful acts in an unlawful manner. Defendants

Cephalon, Endo, Janssen, and Purdue, and the various KOLs and Front Groups with which each of them was allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote the use of opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants Cephalon, Endo, Janssen, and Purdue enlisted various KOLs and Front Groups to make and disseminate these statements in furtherance of their common strategy to increase opioid sales, and Defendants Cephalon, Endo, Janssen, and Purdue – along with the KOLs and Front Groups with whom each of them conspired – knew that the statements they made and disseminated served this purpose.

185. By engaging in the conduct described in this Complaint, Defendant Cephalon agreed with Front Groups FSMB and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with FSMB and APF, Cephalon provided support for FSMB's and APF's deceptive statements promoting opioids and FSMB and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Cephalon's drugs. As set forth above, *Responsible Opioid Prescribing* (Cephalon and FSMB) and *Treatment Options: A Guide for People Living with Pain* (Cephalon and APF) are publications that contained a number of deceptive statements about opioids. They are products of these conspiracies, and the collaboration between Cephalon and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

186. By engaging in the conduct described in this Complaint, Defendant Endo agreed with Front Groups, APF, NIPC, AGS, and FSMB that they would deceptively promote the risks, benefits, and superiority of opioid therapy. They used the deceptive and false tactics enumerated herein: i.e., *Exit Wounds* (Endo and APF) to deceive and entice the Veterans to use their opioid

products; CMEs, and websites that contained a number of deceptive statements about opioids as outlined above. They are products of these conspiracies, and the collaboration between Endo and each of these entities in creating and disseminating these publications, CMEs, and websites is further evidence of each conspiracy's existence.

187. By engaging in the conduct described in this Complaint, Defendant Janssen agreed with Front Groups AAPM, AGS, and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with AAPM, AGS, APF, Janssen provided support for AAPM, AGS, and APF's deceptive statements promoting opioids. They used the deceptive and false tactics enumerated herein: i.e., *Exit Wounds* (Endo and APF) to deceive and entice the Veterans to use their opioid products i.e., *Exit Wounds* (Janssen and APF) are publications, CMEs, and websites that contained a number of deceptive statements about opioids, as outlined above. They are products of these conspiracies and the collaboration between Janssen and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

188. By engaging in the conduct described in this Complaint, Defendant Purdue agreed with Front Groups APF, FSMB, and AGS that they would deceptively promote the risks, benefits, and superiority of opioid therapy. They used the deceptive and false tactics enumerated herein: i.e., *Exit Wounds* (Endo and APF) to deceive and entice the Veterans to use their opioid products. They are products of these conspiracies, and the collaboration between Purdue and each of these entities in creating and disseminating these publications, CMEs and websites is further evidence of each conspiracy's existence.

189. Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in each

scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to the Veterans in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

190. As outlined in this Complaint, Defendants Cephalon, Endo, Janssen, and Purdue played an active role in determining the substance of the misleading messages issued by KOLs and Front Groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated, by both distributing the misstatements themselves and providing their co-conspirators with funding and other assistance with distribution. The result was an unrelenting stream of misleading information about the risks, benefits, and superiority of using opioids to treat chronic pain from sources Defendants knew were trusted by prescribers. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

191. As set forth herein, Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids to the Veterans.

192. As set forth herein, Distributor and Manufacturer Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

193. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

194. The Manufacturer Defendants further unlawfully marketed opioids to the Veterans to further that conspiracy.

195. Defendants' conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the unlawful distribution practices of their competitors to the authorities, which they had a legal duty to do. Each Defendant acted against its commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

196. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the injuries alleged herein.

197. Defendants participated in unlawful acts or lawful acts in an unlawful manner and in furtherance of a civil conspiracy by, among other unlawful conduct:

a. Violating, aiding and abetting in the violation, or causing the violation of 720 ILCS § 5/17-10.5;

b. Violating the Consumer Fraud Act; and

c. Committing common law unjust enrichment.

198. Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonably or lawful excuse.

199. Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

200. By reasons of Defendants' unlawful acts, the Veterans have been damaged and continue to be damaged by paying for the costs of opioid prescriptions for chronic pain and has suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

201. The Veterans seek all legal and equitable relief as allowed by law, including actual damages, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VI – FRAUD AND FRAUDULENT MISREPRESENTATION**

**(Against All Defendants)**

202. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

203. Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements Defendants did make knowingly false. Defendants acted intentionally and/or unlawfully.

204. In Illinois, the elements to state a cause of action for common law fraud are: "(1) a statement by defendant; (2) of a material nature as opposed to opinion; (3) that was untrue; (4) that was known or believed by the speaker to be untrue or made in culpable ignorance of its truth or falsity; (5) that was relied on by the plaintiff to his detriment; (6) made for the purpose of inducing reliance; and (7) such reliance led to the plaintiff's injury. *Olendorf v. General Motors Corp.*, 322 Ill.App.3d 825, 831 (Ill. App. 2001). All such essential elements exist here.

205. Similarly, to state a cause of action for fraudulent misrepresentation in Illinois, the elements are: "(1) a false statement of material fact; (2) knowledge or belief of the falsity by the

person making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 423 (Ill. App. 2015). All such essential elements exist here.

206. As alleged herein, Defendants made false statements regarding their compliance with state law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

207. As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

208. As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading the Veterans and persons on whom the Veterans relied.

209. These false representations and concealments were reasonably calculated to deceive the Veterans, and the physicians who prescribed opioids for the Veterans were made with the intent to deceive, and did in fact deceive these persons, and the Veterans.

210. The Veterans, and the physicians who prescribed opioids, reasonably relied on these false representations and concealments of material fact.

211. The Veterans justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. The Veterans' injuries were proximately caused by this reliance.

212. The injuries alleged by the Veterans herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

213. The Veterans seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including actual damages, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VII –**
**Breach of Implied Warranty of Merchantability Under Illinois Uniform Commercial Code**

214. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

215. Manufacturer Defendants sold and the Veterans purchased opioid drugs.

216. The opioid drugs sold by the Manufacturer Defendants were not fit for their ordinary purposes in that they:

a. Falsely blamed opioid side effects on patients instead of the drugs;

b. Claiming opioids were safe despite having actual knowledge to the contrary;

c. Counseling providers to use higher doses of opioids, without disclosing the risks to prescribers, despite knowledge of said risks;

d. Advising providers to prescribe opioids for extended periods of time without informing them of the increased risk of addiction;

e. Failing to monitor the opioids given to providers; and

f. Directly marketing false information to veterans, like the Veterans.

217. The Veterans used the opioid drugs for their ordinary purpose.

218. Manufacturer Defendants were made aware of that their product was not fit for its ordinary purpose and instead of acting after such notice, chose to actively suppress cases of patient

opioid drug addiction by engaging in a systematic smear campaign to discredit and blame patients such as the Veterans who became addicted to opioid drugs

219. As a direct result of the Manufacturer Defendants' opioid drugs being unfit for such ordinary purpose, the Veterans suffered both personal injury and pecuniary damages.

220. As a consequence of the injuries suffered by Plaintiff as a result of Defendants failure to warn, Plaintiff has incurred attorney's fees and costs.

221. The Veterans seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including actual damages, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VIII - Strict Liability –**
**Product Defect Distributer Defendants and Manufacturer Defendants**

222. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

223. Defendants sold the opioid drugs in the course of Defendants' business to the Veterans.

224. Defendants' opioid drugs were used in a manner reasonably anticipated by the Defendants but were in a defective condition unreasonably dangerous for that use, in that they were among other things highly addictive.

225. As a direct result of the defective condition of the opioid drugs, which existed when they were sold, the Veterans suffered the damages set forth herein.

226. As a consequence of the injuries suffered by the Veterans as a result of Defendants failure to warn, the Veterans have incurred attorney's fees and costs.

227. The Veterans seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including actual damages, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## PUNITIVE DAMAGES

228. The Veterans repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

229. By engaging in the above-described unfair acts or practices, Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner. Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm to the Veterans.

230. Here, Defendants were selling, manufacturing, and/or distributing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the Veterans by these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence, and the safety of the Veterans, and an award of punitive damages is appropriate, as punishment and as a deterrent of like or similar conduct.

231. By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## PRAYER FOR RELIEF

**WHEREFORE,** the Veterans respectfully pray that this Court enter an order of judgment on each count granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

1. Enter Judgment in favor of the Veterans in a final order against each of the Defendants;
2. Actual Damages;
3. Award Compensatory Damages for the pain and suffering of each plaintiff;
4. Allocate monetary damages attributable to each Defendant for each Count pled above;
5. Award judgment against the Defendants requiring Defendants to pay punitive and exemplary damages;
6. The cost of investigation, reasonable attorneys' fees, and all costs and expenses;
7. All other and further relief as this Court deems appropriate and just.

**VETERANS DEMAND A TRIAL BY JURY.**

Respectfully Submitted,

By: *_/s/ Joshua R. Evans, 6318288_*
Edward W. Unsell, 3124228
THE UNSELL LAW FIRM, P.C.
69 S. 9th Street
East Alton, Illinois 62024
(618) 259 3728 PHONE
(618) 259-3783 FAX
Email: office@unselllaw.com
Email: jre@unselllaw.com

By: /s/ Edward M. Tjaden, 6330545
Nicholas P. Meriage #6321120
PITZER SNODGRASS, P.C.
100 South Fourth Street, Suite 400
St. Louis, Missouri 63102-1821
(314) 421-5545
(314) 421-3144 (Fax)
Email: tjaden@pspclaw.com
Email: meriage@pspclaw.com

By: /s/ Greg Shevlin, 6199414
COOK, BARTHOLOMEW, SHEVLIN, COOK & JONES LLP
12 W. Lincoln St.
Belleville, Illinois 62220
(618) 310-3050
(618) 235-7286
Email: gls@cbsclaw.com

***EFILED***
Case Number 2019L 000444
Date: 3/27/2019 4:47 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| JOEL BISHOP, DEAN COLMAN, And PETE LAVITE | ) | 2019L 000444 |
| Plaintiffs, | ) | |
| vs. | ) | Cause No. 2019-L- |
| PURDUE PHARMA L.P. *et al* | ) | |
| Defendants. | ) | |

**VERIFICATION**

The undersigned being first duly sworn on oath, state that we have read the foregoing Complaint and state the assertions stated therein are true and accurate to the best of our knowledge except those stated on information and belief and said assertions are verily believed based upon a reasonable inquiry.

____________________
JOEL BISHOP

____________________
DEAN COLMAN

____________________
PETE LAVITE

Subscribed and sworn before me this 27th day of March, 2019

____________________
NOTARY PUBLIC

OFFICIAL SEAL
EMILY K. WALTEMATE
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 09/25/2022